11 CV 3564

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

JACK HAFIF, ALBERT ADES, MORRIS
MISSRY, VALERIE MIZRAHI, LINDA
ZONANA, and JANET DAYAN, individually and
on behalf of all others similarly situated,

Plaintiffs,

-against-

GEROVA FINANCIAL GROUP, LTD.,
STILLWATER CAPITAL PARTNERS,
INC., STILLWATER CAPITAL
PARTNERS LLC, JACK DOUECK,
RICHARD RUDY, GARY T. HIRST,
MICHAEL HLAVSA, KEITH LASLOP,
JOSEPH BIANCO, JASON GALANIS, and
NET FIVE HOLDINGS, LLC,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
X

Case No.

**CLASS ACTION**

**COMPLAINT**

**JURY TRIAL DEMANDED**



Plaintiffs Jack Hafif, Albert Ades, Morris Missry, Valerie Mizrahi, Linda Zonana, and Janet Dayan by their attorneys, on behalf of themselves and all others similarly situated, alleges the following based upon the investigation of Plaintiffs' counsel, except as to allegations specifically pertaining to Plaintiffs, which are based on personal knowledge. The investigation of counsel included, among other things, Stillwater Capital Partners, LLC and Stillwater Capital Partners, Inc. (collectively, "Stillwater") communications, a review of Gerova Financial Group, Ltd.'s (formerly known as Asia Special Situations Acquisition Corporation) ("Gerova") public filings with the United States Securities and Exchange Commission ("SEC") and press releases, media and news reports, public documents in related matters and other publicly available data, including, but not limited to, publicly available trading data relating to the price and trading volume of Gerova ordinary shares.

## NATURE OF THE ACTION

1.     This is a class action on behalf of a class of all persons and entities, other than Defendants, who invested in any of the Funds (the "Funds")[1] and whose interests in any of

---

[1] The "Funds" include: (1) Stillwater Asset Backed Fund, LP, a Delaware limited partnership; (2) Stillwater Asset Backed Fund II, LP, a Delaware limited partnership; (3) Stillwater WPB Venture Partners I LP, a Delaware limited partnership; (4) Stillwater WPB Venture Partners II LP, a Delaware limited partnership; (5) Stillwater Market Neutral Fund, LP, a Delaware limited partnership; (6) Stillwater Market Neutral Fund II, LP, a Delaware limited partnership; (7) Stillwater Matrix Fund LP, a Delaware limited partnership; (8) Stillwater Real Estate Partners Fund, LP, a Delaware limited partnership (together, these are the "Delaware Funds"); (9) Stillwater Asset Backed Offshore Fund, Ltd., a Cayman Islands exempted company; (10) Stillwater Asset Backed Fund SPV, a Cayman Islands exempted company; (11) SABF II Onshore SPV, a Cayman Islands exempted company; (12) Stillwater Market Neutral Fund Ltd., a Cayman Islands exempted company; (13) Stillwater Loan Opportunities Fund, LLC, a Delaware limited liability company, and its sub fund, the Stillwater Loan Opportunities Fund (Series A); (14) Stillwater Loan Opportunities Fund, SPC, a Cayman Islands exempted company registered as a segregated portfolio company, and its sub fund, the Stillwater Loan Opportunities Fund Segregated Portfolio (Series A); and (15) Stillwater Market Neutral Fund III SPC, a

the Funds were liquidated in the transactions between Stillwater and Gerova consummated on January 20, 2010 (the "Stillwater Transactions") to recover damages caused by Defendants' violations of certain state laws (the "Class").

2.      Plaintiffs' claims of breaches of fiduciary duties, breach of contract, and unjust enrichment arise from Defendants' execution of the Stillwater Transactions. and their subsequent failure to register the shares received by the Class members in the Gerova transaction.  As a result of Defendants' wrongful conduct, instead of receiving shares worth $23.26 in the Gerova transaction, as they were valued on January 19, 2010, the day before the Stillwater Transactions closed, the shares were valued at $5.25 as of February 24, 2011, when the NYSE halted trading in Geneva stock.  Despite the fact that Plaintiffs sought redemption, they have not been able to recoup their investments which are now being held in restricted, unregistered accounts.

3.      More specifically, prior to January 2010, the Funds were heavily invested in overvalued, troubled assets.  However, the Funds ran into a liquidity problem as an increasing number of investors sought withdrawal from or redemption of their accounts.  The Funds lacked the liquid assets to pay out the redemptions requested by their investors.

4.      Accordingly, in mid-December 2009, Stillwater provided an email to the Class concerning "a plan to provide better liquidity for our funds."  Pursuant to this plan, Stillwater would cause all of the Funds' assets to be transferred to Gerova.  Prior to the merger, Gerova had no business operations or assets of its own.

---

Cayman Islands exempted company registered as a segregated portfolio company, and its sub fund, the Stillwater Matrix Segregated Portfolio.

5.     The Funds were insolvent on a cash flow and balance sheet basis at the time of the Stillwater Transactions.

6.     Defendants Doueck and Stillwater orchestrated the Stillwater Transactions, which advanced the interests of Stillwater and Gerova's principals at the expense of the Funds' investors, such as Plaintiffs, and members of the class.

7.     Under the Stillwater Transactions, the Funds purportedly received shares in Gerova, and Gerova received all of the millions of dollars of assets that were formerly held by the Funds.

8.     The Stillwater Transactions primarily benefitted insiders at Stillwater and Gerova, at the expense of Plaintiffs and members of the Class.  As part of the Stillwater Transactions, Stillwater's management received a multi-year contract extension to manage the assets that had been transferred to Gerova. This allowed Stillwater management to continue collecting substantial management fees. Additionally, the Stillwater Transactions made it more likely for Stillwater to earn performance fees going forward, because the Stillwater Transactions waived the performance fee "high water mark," thereby ensuring that Stillwater's ability to earn performance fees going forward was no longer hindered by the poor historical performance of the Funds. Had Stillwater not entered into the Stillwater Transactions, it likely would have been forced to wind down the Funds and thereby would have ceased earning management or performance fees.   Furthermore, Stillwater's management received additional cash incentives for entering into the Stillwater Transactions, including a 2% transaction fee.  In addition, Defendant Doueck, one of Stillwater's principals, was appointed to Gerova's Board of Directors.

9.     The parties to the Stillwater Transactions claimed that an independent audit

4

would be performed on the assets that were transferred to Gerova to ensure the Stillwater assets were properly valued in connection with the Stillwater Transactions.    However, Stillwater did not release any audit report for the 2009 financial statements for at least one year following the Stillwater Transactions. When Plaintiffs finally received the audit reports, the reports showed that the auditors would not issue an opinion on the value of the Funds' assets transferred to Gerova. The auditors' report concluded that Stillwater had not followed generally accepted accounting principles ("GAAP") in valuing the Funds' assets in connection with the Stillwater Transactions.

10.    Gerova has no history of operating a business, both prior to the merger and after the merger.  In the more than two years since the Stillwater Transactions, Gerova has done little more than deal with a series of broken business deals and departures by top management and directors. Gerova's first CEO left after only a few months, with a multi-million dollar severance package that Gerova has allegedly failed to pay him. In December 2010, Gerova announced a merger with London brokerage firm Seymour Pierce and Ticonderoga Securities, and publicly announced that Seymour Pierce's CEO would become Gerova's new CEO. Recently, Gerova announced, without explanation, that the "new" CEO had "delayed" his appointment as CEO. Shortly thereafter, Gerova announced that the majority of its board members were resigning, and that Dennis Pelino, entrepreneur from the logistics industry, would serve as CEO. Days later, Gerova backtracked and announced that Pelino would not be its CEO after all. Then, Seymour Pierce announced that its merger with Gerova would not go forward. Ticonderoga Securities also announced that its deal with Gerova was off. Gerova has never had a permanent Chairman, President, or Chief Executive in place for any significant period of time. With these overhauls in management, Gerova's

stock price has plummeted well over 80% in 2011 alone. On February 23, 2011, the New York Stock Exchange halted trading in Gerova shares.

11.     Through mismanagement and neglect, Gerova's management and board of directors have depleted the value of the assets that Gerova received from the Funds.

12.     In short, all of the Funds' assets were transferred to Gerova--a company that has no history of operating a business--with the Funds receiving far less than market value for the millions of dollars in assets transferred to Gerova in the Stillwater Transactions.  The Stillwater Transactions were plainly a fraudulent conveyance that should be set aside.

13.     In sum, Stillwater and Doueck orchestrated the Stillwater Transactions to avoid winding down the Funds and to enrich Doueck and Gerova insiders at the expense of the Funds' investors, who have received nothing in exchange for the millions of dollars of assets transferred to Gerova in connection with the Stillwater Transactions. Plaintiffs bring this Complaint for monetary damages for breaches of fiduciary duties, aiding and abetting breaches of fiduciary duties, breach of contract, unjust enrichment, fraudulent conveyance, and for an accounting.

## PARTIES

14.     Plaintiff Jack Hafif is a resident of New Jersey and an investor in at least one of the Funds, who held an investment in the Funds at the time of the Stillwater Transactions.

15.     Plaintiff Albert Ades is a resident of New York and an investor in at least one of the Funds, who held an investment in the Funds at the time of the Stillwater Transactions.

16.     Plaintiff Morris Missry is a resident of New Jersey and an investor in at least one of the Funds, who held an investment in the Funds at the time of the Stillwater Transactions.

17.    Plaintiff Valerie Mizrahi, is a resident of New Jersey and an investor in at least one of the Funds, who held an investment in the Funds at the time of the Stillwater Transactions.

18.    Plaintiff Linda Zonana, is a resident of New York and an investor in at least one of the Funds, who held an investment in the Funds at the time of the Stillwater Transactions.

19.    Plaintiff Janet Dayan, is a resident of New York and an investor in at least one of the Funds, who held an investment in the Funds at the time of the Stillwater Transactions.

20.    Defendant Gerova Financial Group Ltd. is a Bermuda corporation, with its principal executive offices in Bermuda, but, on information and belief, Gerova primarily operates from the United States. Gerova is a public company, and its stock traded on the New York Stock Exchange under the symbol "GFC" prior to delisting.

21.    Defendant Stillwater Capital Partners, LLC ("Stillwater LLC") is a Delaware limited liability company, with its principal place of business in New York, New York. Stillwater LLC managed the business and affairs of the Funds.

22.    Defendant Stillwater Capital Partners, Inc. ("Stillwater, Inc.") is a New York corporation with its principal place of business in New York, New York. Stillwater, Inc. is the Investment Manager for the Funds.

23.    Stillwater, Inc. and Stillwater LLC are located at 41 Madison Avenue, 29th Floor, New York, New York 10010.

24.    Stillwater, Inc. and Stillwater LLC are collectively referred to herein as "Stillwater."

25.    Defendant Gary T. Hirst ("Hirst") formerly served as Gerova's Chairman and President and as a member of its Board of Directors.  Through June 1, 2010, Hirst signed Gerova's filings with the SEC as President and executive officer.  On information and belief,

Hirst maintains an office at 1515 International Parkway, Suite 2031, Lake Mary, Florida 32746.

26.    Defendant Richard Rudy ("Rudy") is a principle of Stillwater, Inc. and Stillwater LLC and has authority over those entities. Rudy was a member of the investment committee as part of Stillwater, Inc's engagement as investment manager for the Funds.

27.    Defendant Jack Doueck ("Doueck") is one of two managing principals of Stillwater LLC, and is now a director of Gerova. Doueck sits on the investment committee as part of Stillwater, Inc's engagement as investment manager for the Funds. Doueck maintains an office at 41 Madison Avenue, 29th Floor, New York, NY, 10010. On information and belief, Doueck is a citizen and resident of the State of New York.

28.    Defendant Michael Hlavsa ("Hlavsa") has been Chief Financial Officer ("CFO") and a director of Gerova since March 2007. The Company is being managed by Hlavsa, as the principal executive officer, and the board of directors pending the appointment of a new Chairman, President and CEO.

29.    Defendant Keith Laslop ("Laslop") has been a director of Gerova since May 2008 and was appointed Gerova's Chief Operating Officer ("COO") in June 2010. Laslop was a member of the Gerova Real Estate Committee with Defendants Bianco and Galanis. Laslop resigned on February 10, 2011.

30.    Defendant Joseph Bianco ("Bianco") was appointed as Gerova's Chief Executive Officer ("CEO") in June 2010. Bianco was a member of the three-person Gerova Real Estate Committee with Defendants Laslop and Galanis. Bianco resigned on February 10, 2011.

31.    Defendant Jason Galanis ("Galanis") was the President of Gerova Advisors LLC, a wholly owned subsidiary of Gerova. Gerova announced termination of his employment

with Gerova Advisors on February 10, 2011, but stated that he will "continue to serve the Company as a consultant and will assist new management and the board in connection with acquisitions and financings." Galanis was a member of the three-person Gerova Real Estate Committee with Defendants Laslop and Bianco. In 2007, Galanis was barred from serving as an officer or director of any U.S. public company for five years based on accounting fraud and electronic forgery with respect to a Sarbanes-Oxley certification at Penthouse International, Inc.

32.    Defendant Net Five Holdings, LLC is a Florida limited liability company ("Net Five") which was formed as a real estate joint venture between Gerova, Planet Five Development Group, LLC ("Planet Five") and Robert V. Willison on May 26, 2010. Gerova holds a 49% equity interest in Net Five. However, the Gerova Real Estate Group, LLC, a Florida limited company filed articles of organization with the Florida Department of State on March 25, 2010, and changed its name to Net Five on June 8, 2010. Defendants Hlavsa and Bianco are listed as members of the Managements Board of Net Five on an amendment to the articles of organization dated as of October 25, 2010, and filed with the State of Florida on November 3, 2010.

33.    Stillwater, Inc., Stillwater LLC, Doueck and Rudy are referred to herein as the "Stillwater Defendants."

## JURISDICTION AND VENUE

34.    This Court has jurisdiction over this matter pursuant 28 U.S.C. § 1332(d), because this is a class action in which the matter in controversy exceeds $5 million. Plaintiffs are citizens of the States of New York and New Jersey, and Defendant Gerova is a citizen of a foreign state.

35.    Venue is proper pursuant to 28 U.S.C. § 1391(a) and (c) as Stillwater and the

operations of the Funds are located in this District, Gerova ordinary shares trade on the New York Stock Exchange ("NYSE") in this District, and a substantial part of the events giving rise to the claims asserted herein occurred in this District.

36.     In connection with the facts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## SUBSTANTIVE ALLEGATIONS

37.     For months, and perhaps years, Plaintiffs, and other members of the Class have been unable to withdraw their investments initially made with Stillwater.  Stillwater blamed this problem on a lack of liquidity due to numerous investments in real estate.

38.     Unable to meet the redemption and withdrawal requests of their investors, the Stillwater Defendants entered into a transaction with defendant Gerova thereby selling off the assets in the Funds to a company with no assets or meaningful operations at that time.

39.     According to the proxy statement issued by Gerova to its shareholders, dated January 5, 2010 (the "Gerova Proxy"), Gerova and its advisors met with Stillwater principals at Stillwater's offices in New York City on November 17, 2009 to discuss a potential transaction between Gerova and Stillwater.  On November 22, 2009, Defendant Hirst and other Gerova advisors again met with Stillwater principals at Stillwater's offices in New York City to discuss terms of the proposed transaction and on December 18, 2009, Gerova and Stillwater entered into a term sheet agreement regarding the transaction.

40.     Gerova had no assets or revenue-generating operations at the time of the Stillwater Transactions; Gerova was a shell company whose only purpose, apparently, was to acquire assets. The merger needed the approval of members of the Class.

41.     On December 17, 2009, Stillwater sent Plaintiffs and the Class an email stating "[w]e have a plan to potentially provide better liquidity for our funds and investments."

42.     The contemplated Stillwater Transactions required approval of Stillwater LLC as the general partner of the Delaware Funds, in addition to approval of a majority in interest of the limited partners of the Delaware Funds, and approval by a majority of the directors of the Funds domiciled in the Cayman Islands. Gerova shareholders also voted on the deal.

43.     The Gerova Proxy stated that the general partner of the Delaware Funds and the directors of the Funds domiciled in the Cayman Islands have already approved or are expected to approve the transaction, and that there appear to be no appraisal rights for limited partners in the Delaware Funds who dissent from the merger transaction.

44.     According to the Gerova Proxy, Stillwater and its principals, Defendants Doueck and Rudy, were responsible for "spearheading solicitation of approvals from investors in the Stillwater Funds."

45.     According to a January 13, 2010 Gerova press release and a January 14, 2010 SEC filing, Gerova entered into several share repurchase agreements to ensure a vote in favor of the Stillwater Transactions, including one with a third party who agreed to purchase publicly traded Gerova shares from investors who would likely vote against the transaction, in return for which Gerova would redeem at par, any shares owned by this third party and pay the third party a fee. Separately, Gerova entered into similar repurchase agreements directly with other shareholders to ensure the Stillwater Transactions were approved.

11

46.     On December 31, 2009, Gerova, Stillwater, and the Funds entered into a series of agreements pursuant to which Gerova acquired all assets, liabilities, and equity interests of the Funds, in exchange for Gerova stock.  Specifically, Gerova, Stillwater, and the Delaware Funds executed several Agreements and Plans of Merger, pursuant to which Gerova became the parent of the Delaware Funds.  Gerova, Stillwater, and the Cayman Islands-based Funds executed Asset Purchase Agreements, pursuant to which Gerova received the assets and liabilities of the Cayman-based Funds.

47.     According to Gerova's 2009 Annual Report, Stillwater's unsatisfied redemptions are, in fact, liabilities of Gerova. Gerova's 2009 Annual Report states that "The Stillwater Funds currently owe approximately $30.0 million in unsatisfied investor redemption claims. Many, if not all, of these debts and claims will be required to be repaid by our subsidiaries from the sale of fund assets or collection of accounts receivable before available funds can be redeployed or reinvested." Additionally, the 2009 Annual Report states, "former investors to whom such redemption claims are owed may take legal action to collect these debts which could adversely affect the operations of our subsidiaries."

48.     According to the Gerova Proxy, on January 4, 2010, the terms of the agreements between Gerova, Stillwater, and the Funds were finalized.

49.     On January 20, 2010, Gerova completed its acquisitions of an 81.5% interest in the Amalphis Group and approximately $650 million of assets from the Funds and the Wimbledon Funds.

50.     In accordance with the terms of the Stillwater Transactions, Stillwater received 541,250 Gerova Series A Fixed Price Mandatory Convertible Preferred Shares (the "Preferred Shares"), which are restricted shares, as payment for the interests in the Funds, plus additional

consideration consisting of 266,667 Gerova ordinary shares and a cash fee of approximately $12 million. Gerova received the assets and liabilities or equity interests of the Funds.

51.     The 541,250 Preferred Shares were to be allocated among the Funds, and therefore the Class, based on unaudited estimated net asset values of each of the Funds as of December 31, 2009. Following the closing, the consideration attributed to each of the Funds was to be adjusted based on independently appraised net asset values as of December 31, 2009, by appropriately adjusting the number of ordinary shares issuable upon conversion of the Preferred Shares into Gerova ordinary shares. The audited financial statements and appraised net asset value were to be delivered by March 31, 2010.

52.     After Gerova's payment to Stillwater for the transaction fee and Gerova's payments to third parties and its shareholders (whose shares Gerova agreed to repurchase to obtain a vote in favor of the Stillwater Transactions), Gerova was left effectively with no cash for its operations.

53.     In addition, Gerova and Stillwater entered into an Investment Management Agreement, as of January 20, 2010, pursuant to which Stillwater, Inc. was retained by Gerova to provide investment management services with respect to the assets and Funds obtained by Gerova for a three year term. In exchange, Stillwater, Inc. is to be paid (1) a management fee payable quarterly equal to 0.25% of the aggregate net asset value of the funds, (2) an additional incentive fee at the close of each quarter equal to 20% of any increase in net asset value from the prior quarter, and (3) 44% of cash net proceeds from the sale or liquidation of assets to be reinvested in asset backed loans and related secured lending investments, with such percentage to be increased to 72% of cash net proceeds once Stillwater has been repaid its accrued management and incentive fees owed by the Funds. Additionally, Gerova will pay the managers

13

of the Funds $24 million in unpaid management fees. Moreover, pursuant to the Investment Management Agreement, Stillwater, Inc., as investment manager, is required to form a three-person investment committee, consisting of Defendants Doueck and Rudy and a third person to be designated by Gerova.

54.     In connection with the closing of the Stillwater Transactions, Gerova and Stillwater also entered into a Registration Rights Agreement, dated as of January 20, 2010, pursuant to which members of the Class are entitled to registration of the ordinary shares received upon conversion of the Preferred Shares. According to the Registration Rights Agreement, the Company is required to file a registration statement under the Securities Act of 1933 to register for resale the ordinary shares received upon conversion of the Preferred Shares. However, if the registration statement is not declared effective by July 31, 2010, Gerova is required to issue additional ordinary shares as partial liquidated damages at a rate of 1% of the total number of unregistered ordinary shares up to a maximum of 10%.

55.     On April 23, 2010, the holders of more than two-thirds of Gerova voting shares, including the Preferred Shares, consented to a modification of the conversion terms of the Preferred Shares, providing that they may be converted at any time into ordinary shares of Gerova at a conversion price of $6, as opposed to the prior restrictions which allowed only one-sixth of the Preferred Shares to be converted per month at a conversion price of $7.50. Further, the Registration Rights Agreement was amended and restated as of April 23, 2010 to extend the time to file a registration statement for the restricted shares from April 20, 2010 to July 31, 2010 and extend the effectiveness date of such a registration statements from July 31, 2010 to December 31, 2010.

14

56.     Moreover, the amended and restated Registration Rights agreement provided that upon conversion of the Preferred Shares into ordinary shares, the ordinary shares shall be distributed to the Stillwater investors on the latest of (1) the completion of the post-closing audit and adjustment of assets of the Funds, (2) the effectiveness date of the registration statement, or (3) January 31, 2011, or any other date approved of by Gerova's board of directors and by written consent of the record owners of the converted shares.

57.     On May 14, 2010, Gerova issued a press release on Form 6-K with the SEC, announcing that, at the extraordinary general meeting of shareholders of Gerova on May 12, 2010, the shareholders approved the conversion of the Preferred Shares into ordinary shares. As a result, Gerova had 133,383,310 ordinary shares issued and outstanding.

58.     Then, on December 3, 2010, Gerova filed a Form 6-K with the SEC, which stated:

> On January 20, 2010, we entered into a registration rights agreement, as amended and restated on April 23, 2010, with the record holders of substantially all of our Series A preferred shares issued in January 2010; which preferred shares were subsequently converted into 24,741,667 ordinary shares (123,708,833 shares prior to our recent share consolidation, representing approximately 88.75% of our outstanding shares). Under the terms of such agreement, (a) we agreed to prepare and file a registration statement with the Securities and Exchange Commission ("SEC") registering such ordinary shares for resale under the Securities Act of 1933, as amended (the "Resale Registration Statement") and undertook to cause such Resale Registration Statement to be declared effective on or before January 31, 2011, and (b) the holders of such ordinary shares agreed not to effect any resales or distributions of such shares until the *latest* to occur of (i) delivery of the audits of the December 31, 2009 net asset values of the funds that were our counterparties in a series of transactions that we completed on January 20, 2010 (the "Counterparty Funds"), (ii) January 31, 2011, or (iii) the effective date of the aforesaid Resale Registration Statement. As of the date of this report, the Resale Registration Statement has not been filed with the SEC. As set forth below, it is highly unlikely that our 24,741,667 ordinary shares will be registered under the Securities Act and be available for resale on January 31,

2011. Accordingly, the shares will continue to be restricted as set forth in the agreements and described above.

The audited net asset values of the assets of the Counterparty Funds are necessary in order for us to prepare the financial statements required to be included in the Resale Registration Statement. These audited net asset values were originally due to be delivered to us by March 31, 2010; however, certain of the Counterparty Funds only delivered to us their financial statements in November 2010. This has resulted in a delay in the preparation of the Resale Registration Statement, which we have not yet filed with the SEC. Although we intend to file the Resale Registration Statement as soon as is reasonably practicable, it is highly unlikely that such Resale Registration Statement will be declared effective by the SEC prior to January 31, 2011.

Pursuant to the registration rights agreement, we are subject to share penalties to the holders of our shares under the registration rights agreement in an amount equal to 1% of the number of ordinary shares owned by such holders for each month, or part thereof, commencing February 2011 that the Resale Registration Statement is not declared effective, up to a maximum penalty of 10% of such ordinary shares. The penalty, if any, is payable in kind by the, delivery of additional ordinary shares.

59.     To date, the appraisals and audits necessary to register the shares have yet to take place.  These shares cannot be registered until an appraisal of the assets has been completed. Accordingly, investors in the Funds still hold restricted shares and cannot sell their Gerova stock, and are effectively being held captive while the value of their Gerova shares has declined more than 77%. Approximately 88% of Gerova shares outstanding are restricted.

60.     An article on Hedge Fund Alert, www.HFAlert.com, on January 19, 2011 stated, "[r]eached this week, Stillwater founder Jack Doueck acknowledged it could be another six months before investors are permitted to sell their Gerova shares."

61.     On May 26, 2010, Gerova entered into a real estate joint venture with Planet Five and Robert V. Willison, forming Net Five of which Gerova holds a 49% equity interest.

62.     Pursuant to the Operating Agreement of Net Five and the Contribution Agreement

between Gerova and Planet Five, Gerova contributed to Net Five all of the owned real estate properties and real estate loan assets acquired from the Funds, despite being liable for millions of dollars of outstanding unpaid redemptions.

63.    The Operating Agreement also called for consultation with the Gerova Real Estate Committee on matters requiring guarantees or financial commitments from Gerova or any Gerova subsidiary that directly or indirectly owns Gerova's real estate portfolio. The Gerova Real Estate Committee consists of Defendants Bianco, Laslop, and Galanis. Defendant Galanis was barred by Judge Sweet on April 24, 2007 from serving as an officer or director of any U.S. public company for five years based on accounting fraud and electronic forgery with respect to a Sarbanes-Oxley certification at Penthouse International, Inc.

## The Truth Begins to Emerge

64.    In connection with the closing of the Acquisitions on January 20, 2010, Michael Hlavsa and Stuart Sundlum were removed from their positions as directors of the Company, and Marshall Manley, Michael Kantor and Jack Doeuck were appointed as Gerova directors. Additionally, Marshall Manley was appointed CEO of Gerova, and Tore Nag was appointed as Chief Operating Officer.

65.    On April 8, 2010, less than three months later, Marshall Manley resigned from his positions as CEO and Chairman of the Board of Gerova and Tore Nag resigned from his position as Chief Operating Officer. The Company then appointed Defendant Hirst, Gerova's President and board member, as Chairman of Gerova's Board.

66.    As part of Manley's resignation from his $650,000 a year job with 100% possible bonus, he and Gerova contracted for nondisclosure in exchange for certain payments, which Gerova has failed to make. Accordingly, Manley has sued Gerova in the United States District

17

Court for the Southern District of Florida to recover sums due to him under the contract.

67.    Additionally, Manley's company Marseilles Capital LLC is also suing Gerova, for failure to make several payments due under a Share Repurchase Agreement executed in conjunction with Manley's resignation.

68.    On June 1, 2010, Stillwater received a Wells Notice from the SEC stating that an individual at Stillwater may have violated Section 10(b) of the Exchange Act by disseminating materially misleading statements about the Stillwater asset backed funds' loan portfolio and performance in the monthly Executive Summary reports distributed by Stillwater to investors. According to an attorney at Herrick, Feinstein LLP, Stillwater was notified six months later in writing that the SEC closed the matter with no recommendation of enforcement.

69.    On December 7, 2010, Gerova announced that it entered in an agreement to acquire 100% of London-based investment bank Seymour Pierce Holdings Ltd. and 100% of New York-based institutional broker-dealer Ticonderoga Securities. In connection with this transaction, Seymour Pierce Chairman and CEO, Keith Harris, was to become Chairman and CEO of Gerova effective January 1, 2011. However, Gerova announced in a February 10, 2011 press release that Harris had elected to defer his appointment to these positions.  It was later announced in late February 2011 that the merger discussions with both companies had been called off. A Bermuda news outlet reported that, according to *The Financial Times,* Seymour Pierce called off the merger because of mounting uncertainty about Gerova's finances.

70.    On January 10, 2011, Dalrymple Finance LLC issued a research report on Gerova (the "Dalrymple Report"), describing Gerova as an "NYSE-listed shell game" which is "operated for the benefit of insiders and affiliates, rather than [Gerova] shareholders."

71.    The Dalrymple Report alleged that assets acquired from the Funds were likely

impaired and overvalued, and that this information is being hidden from investors to allow Stillwater to collect fees based on inflated asset values, to the detriment of investors, and to hold the Stillwater investors captive to prevent a stock sell-off, as 88% of Gerova shares outstanding are restricted. The Dalrymple Report stated that their "information regarding the dire state of acquired assets come from none other than Stillwater."

72.     The Dalrymple Report provided the following evaluation of one set of Stillwater's assets as an example:

> The Matrix Group, a UK asset manager is a significant investor in Stillwater Matrix Fund, a lot of the assets of which were purchased by [Gerova]. We consider the independent auditor's report to Matrix is a scathing indictment of Stillwater valuation practices and reported NAV. Pricewaterhousecoopers disclaimed their opinion on Stillwater. We paraphrase their reasoning as follows:
>
> - Inability to obtain sufficient audit evidence in relation to $136 million of fair value as of December 2009.
>
> - Inability to determine the recoverability of receivable balances due (from sub-fund managers that have suspended redemptions) of $20.5 million as of December 2009.
>
> - Uncertainty in relation to Stillwater's ability to repay $95.7 million in leverage
>
> - The auditors of Stillwater concluded that since the evidence over the valuation of a significant portion of the option is unavailable and they were not able to apply other auditing procedures to satisfy themselves as to the valuation of the option, the scope of their work was not sufficient to enable them to express an opinion on the financial statements of Stillwater at 31 December 2009.
>
> - The auditors of Stillwater issued an adverse opinion on the financial statements for the year ended 31 December 2008.
>
> This information tells us that the Stillwater assets were known to be impaired and extremely difficult to value; importantly, Stillwater still has unresolved disputes with auditors over valuation. So difficult is the process that Stillwater's auditors issued an adverse opinion on 2008 financial statements because of their inability to verify stated values.

19

73.     Additionally, without an asset audit, as is necessary to register the restricted shares held by the Class, it is easier for the Company to transfer assets to related entities, such as Net Five, as it has done with the real estate assets acquired from the Funds. According to the Dalrymple Report, "It appears as if management traded 100% ownership in the assets for a 49% non-controlling interest. Not only does this dilute GFC shareholder interest, but as a non-consolidated entity, it puts the operational and financial management of the assets beyond shareholder view."

74.     Further, the Dalrymple Report provided examples of various red flags that should have alerted the Stillwater Defendants of shady dealings at Gerova. For example, the Dalrymple Report explained how the acquisition of 81.5% of the Amalphis Group was a related-party transaction:

> In 2009, the owner of Amalphis, NatProv (of which Mr. Hirst is a shareholder), sold 81.5% of the company to Rineon (RIGI.PK) for $36 million. Current [Gerova] CFO Michael Halvsa was the CFO of [Rineon] at the time. According to [Rineon] filings, the company purchased Amalphis with $36 million in cash. [Rineon] raised the cash to make the acquisition through the sale of preferred shares to Intigy Absolute Return Fund. Intigy is a company controlled by current [Gerova] President Gary Hirst. In this case, Mr. Hirst was, in essence, both the buyer and seller via different entities apparently using limited partners [sic] money to monetize an investment. A tangled web, indeed.

> *     *     *

> A year later in 2010, [Rineon] sold 81.5% of Amalphis to [Gerova, as part of the Acquisitions] for approximately $50-80 million depending on the share price used; NatProv, the firm in which Mr. Hirst is still a shareholder, owns all the common shares of Amalphis, as far as we can gather from regulatory filings. As a result of the transaction, [Rineon] owns approximately 1.8 million shares of [Gerova].

75.     On February 10, 2011, Gerova issued a press release, which was filed on Form 6-K with the SEC, announcing that four members of the Board of Directors had resigned:

Defendants Bianco and Laslop, as well as Arie Bos and Leonard de Waal. Additionally, Defendant Hirst resigned as Chairman and President of the Company, and Defendant Bianco resigned from the position of acting CEO. In light of these resignations, Gerova announced that it intends to reorganize its audit committee, as two of its three members had resigned.

76. On February 15, 2011, the Company issued a press release stating that Dennis L. Pelino withdrew his name from consideration as the Chairman and president of the Company because he and the Company "were unable to reach agreement."

77. On February 23, 2011, Gerova issued a press release acknowledging that the New York Stock exchange had halted trading in its securities, pending an evaluation of Gerova's operations, management restructuring, and business plans, rendering Gerova shares illiquid.

78. On March 15, 2011, Stillwater sent investors a 13 page letter acknowledging that the results of Stillwater's investment enterprise "have [not] been [] what you expected," and that "[a]t this moment, things appear dim."

79. On April 18, 2011, Gerova issued a press release announcing its intention to file a Form 25 with the SEC in order to voluntarily delist from trading on the NYSE its common stock, warrants and units, and to deregister its securities under the Securities Exchange Act of 1934.

## Gerova Is A Corporate Shell That Has Never Operated A Business.

80. Gerova had no business operations before the Stillwater Transactions and has not had any meaningful business operations since the Stillwater Transactions was executed.

81. Gerova has never had a management team in place for any significant period of time. The individual originally identified as the CEO of Gerova, Dennis Dammerman,

never became affiliated with the company.

82.     Currently, it does not appear that anyone is in charge of Gerova. Gary Hirst, who succeeded Manley as Chairman and President of Gerova, resigned in early 2011. Former acting CEO Joseph J. Bianco also resigned in February 2011, along with three additional directors from Gerova's Board. In December 2010, Gerova announced that Seymour Pierce's CEO Keith Harris would become Gerova's new CEO, in connection with a merger with Seymour Pierce and Ticonderoga. Recently, Gerova announced, without explanation, that Harris had "delayed" his appointment as CEO. Gerova next announced that Dennis Pelino would be appointed the new President and Chairman, but he withdrew his name before he was formally appointed. Shortly thereafter, Seymour Price and Ticonderoga announced that both companies had terminated merger talks with Gerova.

83.     Upon information and belief, members of Gerova management have ties to past suspect schemes. Michael Hlvasa, who is currently serving as Gerova's Chief Financial Officer, formerly served as Fund.com's Chief Financial Officer, and former Gerova CEO Bianco, served as Fund.com's CEO. Other individuals associated with Gerova have also been affiliated with Fund.com. Fund.com recently stated that its previous financials are unreliable, and its stock price plummeted by over 99% shortly thereafter.

84.     Jason Galanis, chief executive officer of a wholly-owned subsidiary of Gerova, was responsible for Gerova's merger and acquisition work. Galanis was prohibited by the SEC from serving as an officer or director of a public company for his role in "knowingly and recklessly preparing false financial statements for Penthouse International" and for electronically forging a signature.

85.     Robert Willison, an associate of Gerova responsible for managing Net

Five/Planet Five, a subsidiary of Gerova, was formerly connected to Westmoore Capital, which was shut down by the SEC in 2010, and is alleged to have operated a Ponzi scheme that defrauded investors of $53,000,000.

86.    One of the entities acquired by Gerova in the initial merger, Amalphis, was involved in a series of transactions where Gerova principals were on both sides of the transactions, suggesting the transactions were fabricated to give the appearance of an arm's-length transaction when it was nothing more than self-dealing.

87.    Stillwater received a "Wells Notice" from the SEC on June 1, 2010, accusing it of committing securities fraud and of aiding and abetting securities fraud, by making material misstatements and omissions regarding the value of the Funds' assets.

88.    Gerova's stock price fluctuated wildly throughout 2010, and it went into a free fall in the first weeks of 2011, plummeting almost 80% in early 2011 before the NYSE halted trading on February 23, 2011.

89.    In sum, Gerova has no business, wildly fluctuating stock prices, significant turnover in management and directors, severely delayed audited financial information and, upon information and belief, ties to prior fraudulent and criminal enterprises. The shares in Gerova that the Funds purportedly received as part of the Stillwater Transactions were, at the time of the transaction, worth materially less than the value of the Funds' assets (and, pending receipt of an accurate and complete valuation of the Gerova shares, ostensibly worth nothing at all) that Gerova received in exchange for such shares.

## Economic Loss

90.    As detailed herein, Defendants engaged in a course of conduct that resulted in Plaintiffs and the Class suffering economic loss by depriving them of the value

contained in their accounts in the Funds at the time of the Stillwater Transactions, and leaving them with untradeable restricted shares in Gerova, whose stock price has fallen from $23.26 on January 19, 2010, the day before the Stillwater Transaction closed, to $5.25 on February 24, 2011 when the NYSE halted trading in Gerova stock. The stock has not traded since.

## Class Action Allegations

91.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class of all persons and entities, other than Defendants, who invested in any of the Stillwater funds and whose interests in any of the Funds was liquidated in the transactions between Stillwater and Gerova consummated on January 20, 2010, to recover damages caused by Defendants' violations of certain state laws (the "Class").

92.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at the present time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members of the Class located throughout the United States.

93.     Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class have sustained damages because of Defendants' unlawful activities alleged herein.  Plaintiffs have retained counsel competent and experienced in class and securities litigation and intends to pursue this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs. Plaintiffs have no interests which are contrary to or in conflict with those of the Class that Plaintiffs seek to represent.

94.     A class action is superior to all other available methods for the fair and

efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

95.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated state laws by their acts and omissions as alleged herein;

(b) whether Defendants participated directly or indirectly in the course of conduct complained of herein; and

(c) whether the members of the Class have sustained damages and the proper measure of such damages.

## COUNT I – Breach of Fiduciary Duty
### (Against the Stillwater Defendants)

96.     Plaintiffs reallege and incorporate the paragraphs above, as if set forth fully herein, except that for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud.

97.     Defendants Stillwater, Doueck and Rudy were fiduciaries to Plaintiffs and the Class in that they managed investments made by Plaintiffs and the Class in the Funds, and Plaintiffs and the Class reasonably relied on Defendants Stillwater, Doueck and Rudy to maintain, manage, and run the Funds, for the benefit of Plaintiffs and the Class.

98.     Defendants Stillwater, Doueck, and Rudy have violated their fiduciary duties by: failing to pay redemptions requested by Plaintiffs and other members of the Class; entering into an encouraging and inducing the Class's approval of the Stillwater Transactions without performing due diligence on Gerova, as admitted by Defendant

Doueck; reciving large fees in connection with completion of the Stillwater Transactions and entering into a lucrative investment management contract in connection with the Stillwater Transactions, at the expense of Plaintiffs and the Class; and failing to cause the audit/appraisal necessary for the restricted shares to be registered.

99.     Due to the breaches of fiduciary duties by Defendants Stillwater, Doueck, and Rudy, Plaintiffs and the Class have been damaged.

## COUNT II – Aiding and Abetting Breach of Fiduciary Dutyies
### (Against the Hirst, Hlavsa, and Gerova)

100.     Plaintiffs reallege and incorporate the paragraphs above, as if set forth fully herein, except that for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud.

101.     As alleged above, Defendants Stillwater, Doueck, and Rudy breached their fiduciary duties to Plaintiffs and the Class.

102.     Such breaches of fiduciary duties could not and would not have occurred but for the conduct of Defendants Gerova, Hirst, and Hlavsa, who, therefore, aided and abetted such breaches of fiduciary duties.

103.     Defendants Gerova, Hirts, and Hlasva aided and abetted these breaches of fiduciary duties by engaging in the Stillwater Transactions and acquiring the assets, liabilities, and equity interests of the Funds, paying the Stillwater Defendants large fees at the expense of the Class, and failing to cause the audit/appraisal necessary for the restricted shares to be registered.

104.     Due to the unlawful acts of Defendants Gerova, Hirst, and Hlavsa, Plaintiffs

and the Class have been damaged.

## COUNT III- Unjust Enrichment
### (Against Gerova and the Stillwater Defendants)

105.    Plaintiffs reallege and incorporate the paragraphs above, as if set forth fully herein, except that for purposes of this claim, Plaintiff expressly excludes and disclaims any allegation that could be construed as welling or sounding in fraud.

106.    Defendant Gerova acquired all assets, liabilities, and equity interests of the Funds in the Stillwater Transactions, as described above.

107.    Plaintiffs and members of the Class received untradeable, restricted shares in Gerova, which are currently valueless, in exchange for their interests in the Funds, which is inequitable and unjust.

108.    Plaintiffs and the Class seek restitution.

## COUNT IV- Breach of Contract
### (Against Gerova)

109.    Plaintiffs reallege and incorporate the paragraphs above, as if set forth fully herein, except that for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegations that could be construed as alleging or sounding in fraud.

110.    In connection with the closing of the Stillwater Transactions, Gerova and Stillwater entered into a Registration Rights Agreement, dated as of January 20, 2010, for the benefit of investors in the Funds pursuant to which they are entitled to registration of the ordinary shares received upon conversion of the Preferred Shares.  The Registration Rights Agreement was amended and restated as of April 23, 2010 to extend the time to file a registration statement for the restricted shares from April 20, 2010 to July 31, 2010 and

27

extend the effectiveness date of such registration statements from July 31, 2010 to December 31, 2010.

111.     Registration of the ordinary shares received upon conversion of the Preferred Shares is a material provision of the Registration Rights Agreement and assigns some value to the otherwise valueless consideration received by members of the Class for giving up their interests in the Funds.

112.     As of the date of this complaint, registration of such shares has not occurred and is thus a breach of the Registration Rights Agreement.

113.     Due to Gerova's breach of contract, members of the Class have been damaged.

## COUNT V- Fraudulent Conveyance
### (Against Gerova, Net Five, Laslop, Bianco, and Galanis)

114.     Plaintiffs reallege and incorporate the paragraphs above, as if set forth fully herein.

115.     The claim is brought under the Florida Uniform Fraudulent Transfer Act, Section 726.105.

116.     Plaintffs and members of the Class whose redemption claims remain unsatisfied are creditors of Gerova. According to Gerova's 2009 Annual Report, "Many if not all, of these debts and claims will be required to be repaid by our subsidiaries from the sale of fund assets or collection of accounts receivable before available funds can be redeployed or reinvested."

117.    Defendants Gerova, Laslop, Bianco, and Galanis transferred all of the owned real estate properties and real estate loan assets that Gerova acquired from the Funds to Defendant Net Five.

118.    Defendants Gerova, Net Five, Laslop, Bianco, and Galanis made this transfer with actual intent to hinder, delay, or defraud Plaintiffs and the Class, as evidenced by the fact that net five is a related-party and Gerova, its principals and subsidiaries, retain control of the property.

## COUNT VI- For an Accounting
### (Against all Defendants)

119.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 92, above.

120.    Contrary to promises in the Consent Solicitation and following it, contrary to the terms of the various Funds' partnership agreements, Stillwater, and Gerova have not produced an audit or accounting of the properties the Funds own and/or owned.

121.    The Defendants have been using the Stillwater assets to their own ends, namely, to participate in self-dealing transactions.

122.    A material condition of the Gerova business combination was that Defendants perform an accounting of Stillwater's assets.

123.    Such an accounting will permit Defendants to assess the number of shares due to Plaintiffs, and members of the Class.

124.    Gerova has twice failed to perform an accounting, pushing back Plaintiffs' and members' of the Class receipt of Gerova shares first from July 2010 to January 2010, then from January 2011 to an uncertain date, but at the earliest June 2011.

29

125.    The failure to perform an accounting has and continues to cause Plaintiffs and members of the class injuries, as their shares of Gerova are totally illiquid.

126.    Defendants breached their duties by engaging in transactions that alienated and dissipated Gerova's assets at less than fair value to Gerova insiders.

127.    Gerova has also failed to issue financial statements for the past year.

128.    Plaintiffs and all Class members are entitled to an accounting.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for a judgment as follows: declaring this action be a proper class action; appointing Plaintiffs as Lead Plaintiffs and approving their selection of their attorneys as Lead Counsel; awarding damages, including interest; awarding reasonable costs, including attorneys' fees; and such equitable or injunctive relief as the Court may deem proper.

## **JURY DEMAND**

Plaintiffs demand a jury trial in this action.


Dated: New York, New York
May 24, 2011


MURRAY, FRANK & SAILER LLP

By:_____

Marvin L. Frank (MF-1436)
Lee A. Albert (*Pro Hac* to be filed)
Gregory A. Frank (GF-0207)
275 Madison Avenue, Suite 801
New York, NY 10016
Tel: (212) 682-1818
Fax: (212) 682-1892

Attorneys for Plaintiffs